**Opinion filed October 24, 2024**



# In The

# Eleventh Court of Appeals

_____

## No. 11-22-00292-CR

_____

## MARKES D. BUCHANAN, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 32nd District Court**
**Nolan County, Texas**
**Trial Court Cause No. 13665**

## M E M O R A N D U M   O P I N I O N

Appellant, Markes D. Buchanan, was charged with intentionally causing the death of Tashaun Beavers by shooting him while in the course of committing or attempting to commit the offense of robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2024). The jury convicted Appellant of capital murder. Because the State did not pursue the death penalty, the trial court sentenced Appellant to confinement for life without parole in the Institutional Division of the Texas Department of Criminal Justice. *See* PENAL § 12.31(a)(2) (West 2019). In his first issue on appeal, Appellant challenges the sufficiency of the evidence

supporting his conviction. In his second issue, Appellant asserts that there was insufficient evidence to support the trial court's order for him to pay attorney's fees. We modify and affirm.

*Background Facts*

On November 10, 2019, Shirley Gutierrez went to Beavers's house to buy heroin. She testified that she had been selling and distributing heroin for Beavers, whom she referred to as "T." After picking the heroin up, Gutierrez traveled to Roscoe to make a sale, and returned to Beavers's house with the money approximately an hour later. When Beavers did not answer the door, Gutierrez entered the house, heard a strange noise, turned on the light, and saw Beavers lying in a pool of blood. Gutierrez then panicked and ran to Jaime Briscoe's home across the street for help.

Briscoe testified that Gutierrez frantically knocked on her door the night of the incident, and told her Beavers was lying in a pool of blood across the street. Briscoe ran to Beavers's house, saw him lying near the door covered in blood, then had her daughter call 9-1-1.

Sergeant Armando Renteria with the Sweetwater Police Department responded to the scene and saw Beavers on the floor in a pool of blood with a gunshot wound to the head. After EMS arrived, the responding officers searched the scene for evidence. Sergeant Renteria secured a firearm located next to Beavers. Sergeant Renteria also located a bullet on the couch and a 9-millimeter shell casing behind a chair to the right of the front door. There was a bullet hole in the wall between the living room and kitchen.

Sergeant Chris Friedle with the Sweetwater Police Department photographed the 9-millimeter shell casing found behind the chair. Sergeant Friedle testified that, in his experience, the location of the shell casing meant that the shot would have come from just inside the doorway. Sergeant Friedle testified that the back door's

deadbolt was locked, and he believed that, without a key, it was unlikely that anyone ran out the back door.

Officers located scales, fifty dollars, two firearms, and a large amount of narcotics in the home. Sergeant Renteria testified that, based on his training and experience, these items indicated that the residence was a "trap house."[1] Sergeant Friedle photographed other evidence including marihuana, methamphetamine, heroin, firearms, scales, and baggies. Sergeant Friedle observed that the freezer, which is sometimes used by distributors as a hiding place, was open and mostly empty. The drug paraphernalia and lack of furniture in the home indicated to Sergeant Friedle that Beavers's house was used for the distribution of narcotics.

Dr. Susan Roe, a forensic pathologist for the Tarrant County Medical Examiner's Office, performed Beavers's autopsy. Dr. Roe concluded that Beavers sustained a fatal gunshot wound to the head that traveled from left to right. According to Dr. Roe, the lack of soot powder or stippling near the entrance wound indicated that the shot was fired from at least two feet away.

Patrick Cantu was watching a football game at his father's house on the night of the incident. Cantu testified that he went outside to smoke and "heard a loud bang." He then saw a thin Black male "sneakingly run across the street" from Beavers's house. The individual then turned and ran back to the front of the house to retrieve "something pretty large" "because he had to carry it with both hands." Cantu said that the man then ran back across the street and out of sight. "[L]ess than a minute or so" later, Cantu saw a larger Black male wearing a "do-rag" running from Beavers's house traveling in the same direction. Cantu testified that he could not see the faces of the men because they were too far away.

---

[1]Sergeant Renteria stated that a trap house is "just a house that's used to sell narcotics, not to live in other than just to come in, sell narcotics and then go on to another facility or place."

3

Josey Dauel, who had been in an on-and-off relationship with Beavers since 2015, testified that she knew Beavers sold and distributed narcotics. She had also known Appellant for over ten years. Dauel testified about three interactions she had with Appellant after Beavers's death.

Dauel first saw Appellant at Lulu's Supermarket in Sweetwater on December 25, 2019. Dauel observed Appellant acting "nervous" and "fidgety" when she stood behind him. Dauel saw Appellant pull a large amount of cash from his pocket, including "a lot of $50 bills." Dauel had never seen Appellant with that amount of money.

Dauel next saw Appellant at a game room "jumping from game to game" "just spending money," which she found peculiar because she had "never seen him with excess money ever." Dauel last saw Appellant walking down the street while she was in a friend's car and decided to ask him who killed Beavers. Appellant replied that he had heard it was Dauel's brother. Dauel asked Appellant if he did it, and he said no as he stared at the floor. When Dauel asked Appellant "if he could look [her] in [her] face and say that" he "side-eyed" her, said he did not do it, and continued to stare at the floor.

Detective Daniel Olds with the Sweetwater Police Department testified that Dauel contacted him to discuss her suspicion that Appellant, Adrian Martin, and Tristan Perrigo were involved in Beavers's death. After speaking to Dauel, Detective Olds interviewed Appellant. During his first interview, Appellant denied any involvement in Beavers's death. After Detective Olds interviewed Perrigo and Martin, all three men were arrested for the murder of Beavers. Detective Olds conducted a second interview with Appellant after he was arrested.

Lieutenant Anthony Bennett with the Criminal Investigations Division of the Texas Department of Public Safety assisted Detective Olds with the second interview of Appellant. Lieutenant Bennett testified that Appellant first maintained

4

that he was not involved and did not know Beavers. However, Appellant later admitted that Beavers was his neighbor and that Martin told him about a plan to rob Beavers. Appellant first said that he was dismissive of the plan, but he later said that he told Martin, Perrigo and a "different Markes" where Beavers lived in exchange for $1,500.

When Lieutenant Bennett asked Appellant about Perrigo's statement that he ran from the scene after the gunshot, Appellant stated, "if that were me, I would have shot [Perrigo]," and gestured with his left hand. When the same topic was addressed again later in the interview, Appellant said that if Perrigo had run from the scene, he "would have popped his a-s too," and again gestured with his left hand. Lieutenant Bennett "believ[ed] [Appellant] was reliving the event" because law enforcement suspected that the shooter was left-handed. Lieutenant Bennett also observed that Appellant's right "trigger finger" was stuck in an extended position for long periods during the interview. It appeared to Lieutenant Bennett that either a defect or injury caused Appellant to have limited mobility in that finger.

Martin pleaded guilty to aggravated robbery and testified for the State. Martin had known Appellant for approximately two years, and they had seen each other from time to time. Martin did not know Beavers prior to the murder, and had only learned of him when Appellant asked for help committing a robbery against a man named "T." Martin testified that he rejected Appellant's request for help several times, but eventually, he made a call to Perrigo, who had previously told Martin that he needed money.

Martin testified that Appellant and Perrigo came to his apartment and that Perrigo brought a 9-millimeter firearm because Martin did not want to use his personal firearm for the robbery. Martin testified that Appellant and Perrigo left his apartment after nightfall to walk to Beavers's house, and Perrigo carried a duffle bag. Martin testified that the group met at his apartment only once. Martin called

both Appellant and Perrigo after they left, but he believed he only spoke with Perrigo once and did not speak to Appellant. Martin testified that, after the robbery, Perrigo came back to his apartment for a brief time and told "his side of the story."

Martin did not speak with Appellant until the following day when Appellant asked Martin to pick him up in Abilene. Martin testified that his wife, Lauren Martinez, drove him to pick up Appellant. Martin stated that Appellant was quiet until they began to drive back, but he appeared to be shaking and seemed paranoid and nervous. Martin testified that when he asked Appellant about what happened, Appellant replied, "I shot him." He stated that Appellant did not say who he shot. Martin stated that he responded to Appellant with a "hateful" look because he was unsure of what to say to him. Martin testified that Appellant left $3,000 in the backseat of the car but did not say what the money was for. Martin stated that he took and spent that money. Martin testified that he and Appellant did not speak in person again, but they communicated through text messages about Martin's discomfort with what had happened.

Lauren Martinez, Adrian Martin's wife,[2] testified that on the day after Beavers's death, Martin asked her to drive him to a hotel in Abilene. There, they picked up Appellant and gave him a ride back to Sweetwater. During the drive, Martinez observed Appellant acting strange and talking to himself. She recalled hearing Appellant say, "I shouldn't have killed him." Martinez did not know who Appellant was talking about, and was unaware of Martin's involvement, but soon after, she began to receive threats and saw information about the incident online.

Tristan Perrigo admitted to his involvement and testified against Appellant after pleading guilty to the lesser charge of aggravated robbery. Perrigo explained that he knew Martin through mutual friends. Approximately a week before

---

[2]Martinez also testified on her husband Martin's behalf during his sentencing hearing. She was never interviewed by police and never contacted the police about Martin's involvement.

Beavers's death, Perrigo obtained a stolen 9-millimeter handgun and gave it to Martin.

Perrigo testified that Martin asked him to come to his house with Appellant on the day of the incident. Perrigo said that he had never met or had contact with Appellant before that day. Perrigo testified that Appellant told him that they were going to rob someone. After the meeting, Perrigo said that he returned home and, when it got dark, Martin reached out to him again. Perrigo stated that they met back at Martin's to discuss the plan, and then he and Appellant walked to a nearby park to discuss how to get into Beavers's house. Perrigo testified that Appellant told him that they needed to get the money located in the refrigerator or freezer. Perrigo said that Appellant told him that Beavers was always posting money on Facebook, and he knew there would be money there; he also instructed Perrigo that if there was more money than expected, he should not tell Martin.

Perrigo testified that when they left the park, they walked to Beavers's street and regrouped one more time before going to the front door. Perrigo testified that Appellant knocked on the door and when Beavers asked who it was, Appellant responded, "Kes." Perrigo stated that after the door opened, he heard a gunshot and the door slammed shut. Perrigo testified that he ran away from the scene with the duffle bag he had brought. Perrigo stated that he dropped the bag in the street but quickly recovered it and continued to flee. Perrigo testified that he ran from the scene to Martin's house alone and Appellant did not follow him. Perrigo said that he never received any money from Appellant or Martin after the robbery. Perrigo stated that he only saw Appellant once after the incident, when he was in a vehicle with Josey Dauel.

Appellant's brother, Alex Buchanan, testified in his defense. Alex maintained that Appellant was home on the night of Beavers's death. Alex testified that he left

periodically throughout the night, but each time he returned, Appellant was home. Alex also stated that Appellant was still home when he woke up in the morning.

*Analysis*

*Sufficiency of the Evidence*

In his first issue, Appellant asserts that there was insufficient evidence to support that Appellant participated in the intentional killing of Beavers. We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* TEX. CRIM. PROC. ANN. art. 38.04 (West 1979); *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing

8

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514, S.W.3d 227, 232 (Tex. Crim. App. 2017).

A person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery. PENAL § 19.03(a)(2). One manner of committing robbery is if, in the course of committing theft, a person intentionally, knowingly, or recklessly causes bodily injury to another. *Id.* at § 29.02(a)(1). Theft is defined as unlawfully appropriating property with the intent to deprive the owner of the property. *Id.* at § 31.03(a).

In the case of capital murder committed in the course of a robbery, there is no requirement that the intent to cause death be premeditated or formulated prior to the commission of the robbery. *Ayala v. State*, 267 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (citing *Rousseau v. State*, 855 S.W.2d 666, 674 (Tex. Crim. App. 1993)). Instead, the intent to cause death must only have been formulated when the actor commits murder. *Id.* at 432. The use of a firearm, a deadly weapon per se, is evidence from which the jury can infer a specific intent to kill, "unless in the manner of its use it is reasonably apparent that death or serious injury could not occur." *Id.* (quoting *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999)). Additionally, the failure to report that a shooting occurred or seek medical attention for the victim are circumstances from which the jury can infer a specific intent to kill. *See Evans v. State*, 440 S.W.3d 107, 113 (Tex. App.—Waco 2013, pet. ref'd) (finding sufficient evidence of specific intent to kill when defendant

did not seek medical help, did not report the shooting, and showed no remorse); *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (finding sufficient evidence of specific intent to kill when defendant left the scene of the robbery without seeking medical attention for the man he shot).

We additionally note that the court's charge allowed the jury to convict Appellant either as a primary actor or as a party. Under Section 7.01 of the Penal Code, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." PENAL § 7.01(a) (West 2021); *see Adames v. State*, 353 S.W.3d 854, 862 (Tex. Crim. App. 2011). Section 7.02(a)(2) of the Penal Code assigns criminal responsibility to a person "for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." PENAL § 7.02(a)(2); *see Adames*, 353 S.W.3d at 862.

Appellant asserts that the accomplice witness testimony of Martin and Perrigo is the only evidence of his participation in the shooting. Thus, according to Appellant, his conviction based solely on accomplice witness testimony violates Article 38.14 of the Texas Code of Criminal Procedure. *See* CRIM. PROC. art. 38.14 (West 2023).

A defendant cannot be convicted "upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." *Id.* Corroborating evidence is not sufficient "if it merely shows the commission of the offense." *Id.* When, as in this case, the jury's verdict could have been based on the testimony of an accomplice, the sufficiency review must incorporate the accomplice witness rule stated in Article 38.14. *See id.* In reviewing the sufficiency of the corroborating evidence, we eliminate the accomplice witness testimony from consideration and focus on the remaining portions of the record to

10

determine whether there is any evidence that tends to connect the defendant with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999). The corroborating evidence may be direct or circumstantial and need not be sufficient by itself to establish the defendant's guilt; it is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). Such corroboration may come from small details. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999).

We review the corroborating evidence in the light most favorable to the verdict. *Taylor v. State*, 328 S.W.3d 574, 578 (Tex. App.—Eastland 2010, pet. ref'd). Once corroborated, testimony of an accomplice may be considered by the jury in the same manner as any other competent evidence. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

Here, there was sufficient evidence to corroborate the accomplice witness testimony. Appellant notes six examples of non-accomplice testimony that the jury had available to consider, including: (1) Appellant's admissions during his interview with Lieutenant Bennett of his participation in the robbery including that he told Martin and Perrigo where Beavers lived, and that he discussed receiving a cash payment for the information that he provided to them; (2) Lieutenant Bennett's testimony regarding the limited mobility of Appellant's right trigger finger; (3) Martinez's testimony about Appellant's admission to shooting someone; (4) Dauel's testimony about seeing Appellant with a large amount of cash; (5) Dauel's implication of Appellant, Martin, and Perrigo to police; and (6) Cantu's testimony about two Black males running from Beavers's house after the shooting.

Rather than denying the existence of independent evidence, Appellant challenges its credibility and corroborative value. Appellant asserts that the non-

accomplice testimony is "woefully lacking," and insufficient for a rational trier of fact to connect Appellant to the offense. To support his claim, Appellant makes the following contentions:

- The testimonies of Martinez and Martin about Appellant's admissions in the car the next day were contradictory and were not proof that Appellant was the shooter.

- Appellant's brother testified that Appellant was home the morning after the murder and, therefore, could not have been with Martin and Martinez.

- Perrigo denied running from the scene with Appellant, but Cantu testified that the men he saw ran in the same direction.

- Lieutenant Bennett's insinuation that Appellant could have been a left-handed shooter was insufficient to show that he was the shooter without testing. Additionally, Perrigo was also left-handed.

- Appellant's admissions in the interview with Lieutenant Bennett are insufficient to support a finding that he was the shooter because he only admitted to pointing out the location of Beavers's residence.

The State contends that, in addition to the evidence cited by Appellant, additional non-accomplice evidence is sufficient to connect Appellant to the offense, including: (1) Officer Friedle's testimony that the shot came from the doorway of the home; (2) Appellant raising his *left* hand to gesture during the interview with Lieutenant Bennett; and (3) Dr. Roe's testimony that the bullet projectile traveled from left to right in Beavers's body, indicating the shooter was left-handed.

We first note that under the law of parties and the manner in which the trial court charged the jury, Appellant's conviction for capital murder was not necessarily dependent on the jury determining that he was the shooter. *See* PENAL § 7.02(a)(2).

Perrigo testified that after Beavers answered the door, he heard a gunshot and immediately ran from the residence. On the same night, Cantu, a non-accomplice, observed two men fleeing Beavers's house at different times. Therefore, the jury could have rationally inferred that Perrigo was the individual Cantu saw running first

12

and Appellant was the second. Further, Sergeant Friedle testified that the evidence found at the scene indicated that the shot came from the doorway of Beavers's house. This determination is consistent with Perrigo's testimony that Appellant shot Beavers from the doorway, and the jury could have rationally relied on Sergeant Friedle's testimony as corroborative evidence.

Second, Martin testified that Appellant admitted to shooting Beavers the day after the robbery. Martinez testified that she overheard Appellant say, "I shouldn't have killed him." The jury could have rationally relied on the similar accounts of how Appellant admitted to Martin within earshot of Martinez that he shot Beavers.

Third, both Martin and Perrigo maintained that Appellant had exclusive control over any money from the robbery. And while Appellant gave Martin $3,000, Perrigo received none. When Dauel testified to seeing Appellant with more money than ever before, after the robbery, the jury could have rationally inferred that that money was from the robbery of Beavers.

Finally, Appellant admitted to Lieutenant Bennett that he was aware of the plan to rob Beavers and participated by pointing out where Beavers lived in exchange for $1,500. Therefore, the jury could have rationally determined that Appellant's own admissions about his involvement in the planning of the robbery sufficiently tended to connect him to the offense.

In summary, the jury could have rationally inferred and found that Cantu's testimony of the two Black males running from Beavers's house, Officer Friedle's testimony the shot came from the doorway, Martinez's testimony about Appellant's admissions in the car, Dauel's testimony about Appellant's sudden wealth after the murder, and Appellant's admissions to law enforcement all tended to corroborate Martinez's and Perrigo's testimony that Appellant was at least complicit in the intentional killing of Beavers during the robbery. *See Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) ("The direct or circumstantial non-accomplice

13

evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense."); *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) ("Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration."). Therefore, Martin's and Perrigo's accomplice witness testimony was sufficiently corroborated, and we may consider them in conducting our review of the sufficiency of evidence.

Regardless of the slight inconsistencies that Appellant notes between the accomplice and non-accomplice witness accounts, the jury was the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See* CRIM. PROC. art. 36.13 (West 2007), art. 38.04; *Brooks*, 323 S.W.3d at 899. As such, the jury was entitled to accept or reject any or all testimony of any witness. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Ibarra v. State*, 479 S.W.3d 481, 488 (Tex. App.—Eastland 2015, pet. ref'd). Further, the State presented independent evidence to support that Appellant was the shooter. The testimony about the deformity to Appellant's right hand, the left-handed gestures he made, and the medical examiner's determination of a left-to-right projectile path in Beavers's body could lead a rational jury to connect Appellant as the left-handed shooter that committed the murder. Thus, the jury could have rationally inferred that Appellant intentionally shot Beavers during the commission of the robbery.

The jury was entitled to draw reasonable inferences from the evidence and could have determined that Martin's and Perrigo's testimonies were supported by the non-accomplice witness testimony presented by the State. *See Jackson*, 443 U.S. at 319. Therefore, the jury could have rationally found that Martin's and Perrigo's testimony, along with other corroborating evidence presented at trial, sufficiently tended to connect Appellant to the shooting of Beavers. *Malone v. State*, 253 S.W.3d 253, 258–59 (Tex. Crim. App. 2008). Viewing the evidence in the light most

favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Appellant committed the offense of capital murder, either as the principal actor or as a party. We overrule Appellant's first issue.

*Order to Pay Attorney's Fees for Court-Appointed Attorney*

In his second issue, Appellant asserts that the trial court erred by requiring him to pay court-appointed attorney's fees in the amount of $12,972.38. Appellant contends that it was error for the trial court to assess court-appointed attorney's fees because he was found indigent at the outset of the case and the record does not contain evidence of a material change in his financial circumstances. The State concedes that Appellant's contention is correct.

An indigent defendant cannot be taxed the cost of services rendered by his court-appointed attorney unless the trial court finds that the defendant has the financial resources to repay those costs in whole or in part. *Smith v. State*, 631 S.W.3d 484, 501 (Tex. App.—Eastland 2021, no pet.) (citing *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)); *see* CRIM. PROC. art. 26.05(g). The Texas Court of Criminal Appeals has held that the trial court must find that the defendant had the ability to repay court-appointed attorney's fees prior to assessing such fees against an indigent defendant. *Cates v. State*, 402 S.W.3d 250, 251–52 (Tex. Crim. App. 2013); *see also Mayer*, 309 S.W.3d at 556 ("[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees."). Further, a "defendant who is determined by the [trial] court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." *Cates*, 402 S.W.3d at 251 (quoting CRIM. PROC. art. 26.04(p))

Following Appellant's arrest, the trial court determined that Appellant was indigent and appointed trial counsel to represent him. Appellant's request for a

reduction of his bond due to his indigency was denied, and Appellant remained incarcerated until trial. Upon Appellant's notice of appeal, he requested a copy of the record without charge due to his indigency status. The trial court granted Appellant's request stating, "the Defendant is indigent and his circumstances have not changed." Neither before or after this order did the trial court receive evidence, or issue a finding, that Appellant had the ability to pay any portion of the attorney's fees that were incurred by his court-appointed attorney. Moreover, the record shows that the trial court: (1) determined that Appellant was in fact indigent; and (2) made no subsequent determination that Appellant's financial circumstances had materially changed or that he had the financial resources or ability to pay the court-appointed attorney's fees of $12,972.38 that were assessed against him. Because the trial court improperly ordered Appellant to pay the attorney's fees of his court-appointed attorney, we must modify the trial court's judgment to remove the improperly assessed fees. *See Cates*, 402 S.W.3d at 252; *Smith*, 631 S.W.3d at 501. We sustain Appellant's second issue.

*This Court's Ruling*

We affirm the judgment of the trial court as modified.

JOHN M. BAILEY
CHIEF JUSTICE

October 24, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.